[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff brought this action seeking specific performance of a fixed price option to purchase leased premises, as well as damages for breach of contract.
Based on a fair preponderance of the credible evidence, the court finds that the following facts were proven:
In January, 1985 the defendants were the owners of the real property known as 8 Orange Street, New Haven, Connecticut. At that time, and for some time before, the defendant, Angelo Anastasopoulos, operated a restaurant business at the premises.
Prior to that date, the plaintiff and Angelo Anastasopoulos began negotiating the purchase by the plaintiff from the defendant of the restaurant business which he conducted on the premises. The negotiations resulted in an agreement whereby the defendant Angelo Anastasopoulos sold the restaurant business to the plaintiff for the sum of thirty five thousand ($35,000.00) dollars.
Additionally, the plaintiff and defendants began negotiating a lease agreement incidental to and contemporaneous with the sale of the restaurant business. The defendant, Angelo Anastopoulos, was the active party in negotiating the contract of sale and the lease on behalf of himself and his wife, and handled all matters connected with the lease matter. The defendant, Maria Anastopoulos, was not knowledgeable about such matters and permitted her husband to handle negotiations on her behalf. Mrs. Anastopoulos does not speak English well and cannot read English. Although she signed the lease, she did not know its contents. She felt it was her husband's business and left all dealings to him. Consequently, Angelo Anastopoulos served as agent for his wife and was vested with a general authority to deal with the plaintiff concerning the lease.
The lease agreement related to the first floor of the premises. The negotiations involved, among other matters, the granting of an option to purchase the premises, as well as a CT Page 5118 reservation of a right of first refusal.
Both parties retained counsel for the purpose of drafting and memorializing their agreement. The plaintiff retained Lawrence Nadel, Esq. and the defendants retained Joel Alderman, Esq.
The plaintiff's counsel drafted a lease agreement which was reviewed and discussed with defendants' counsel prior to closing the transaction.
At the closing, various documents, including the lease agreement, agreement for the sale and purchase of the business and a covenant not to compete were executed. The parties were represented by their respective counsel at the closing. The lease agreement was executed by the defendants with the acknowledgement taken by their attorney. The plaintiff's signature appears on the lease agreement and is duly acknowledged and witnessed.
While the signature on the lease agreement purporting to be the plaintiff's is not hers, the lease does represent what she agreed to. Moreover, the parties both partially performed the lease. The parties had a valid lease agreement.
A rider appended to the lease agreement, prepared by the plaintiff's attorney, contains both an option to purchase (paragraph Thirty-first) and a right of first refusal (paragraph Thirtieth). These paragraphs contain the following language:
 "Thirtieth — Right of First Refusal. Should the Landlord, during the term of the Lease, elect to sell the Leased Premises, or the building of which the Leased Premises are a part, Tenant shall have the Right of First Refusal to meet any bonafide offer of sale upon all of the same terms and conditions of such offer. Upon the Tenant's failure to meet such bonafide offer thereof is received by Tenant from Landlord, Landlord shall be free to sell the Leased Premises to such third person in accordance with the terms and conditions of such bonafide offer.
 Thirty-first — Option to Purchase. Tenant shall have the Option to Purchase the entirety of the building owned by Landlord known as 8 Orange Street, New Haven, Connecticut, more particularly described in a certain deed recorded at Volume 2695, Page 113, of the Land Records of the City of New Haven, by paying to Landlord the sum of Ninety Thousand ($90,000.00) Dollars, in cash, less such payments as may be CT Page 5119 necessary to discharge any valid lien upon the Premises, and subject to such adjustments as are then prevailing in the City of New Haven for similar properties. This Option shall be exercised by providing written notice of Tenant's election to exercise such Option, not more than sixty (60) days nor less than thirty (30) days prior to the closing date selected by Tenant. The Tenant shall pay the entirety of the Option price at the closing, and the property shall be conveyed by a full Warranty Deed with all relevant covenants thereunder. All of the adjustments for said property shall be paid in accordance with the practice then prevailing in the City of New Haven, County of New Haven, and State of Connecticut. This option will expire automatically on April 30, 1988."
The option to Purchase runs for a term of three years from the inception of the lease agreement.
The right of first refusal is not limited in time; it exists during the full term of the lease agreement.
On or about May 1, 1985 the plaintiff took occupancy of the first floor of the premises. The plaintiff fully performed all the terms, conditions and covenants of the lease.
On that date and for some time thereafter, the defendants used the second floor of the premises for storage purposes. On or about November 26, 1985 the defendants leased the second floor of the premises to Taso, Inc., a Connecticut corporation. The term of the lease between the defendants and Taso, Inc. commenced on December 1, 1985 and was to terminate October 30, 1990. The lessee, Taso, Inc., was entitled to exercise an option to renew for one extended term of five years.
A Notice of Lease dated December 15, 1985 as to the Taso lease was recorded on the land records of the City of New Haven. The lessee, Taso, Inc., took possession of the second floor of premises pursuant to the written lease agreement and still occupies the premises.
In the beginning of 1987, the plaintiff consulted William Gallagher, Esq. for the purpose of seeking advice pertaining to the exercise of the option to purchase in the lease agreement.
On the advice of counsel, the plaintiff applied for and, in May, 1987, secured financing through Lafayette Bank in the amount CT Page 5120 of one hundred twenty thousand ($120,000.00) Dollars, in order to purchase the property and perform necessary rehabilitation.
On May 15, 1987, the plaintiff, through her attorney William F. Gallagher, mailed a letter to the defendants stating that she was exercising her option to purchase the property for $90,000.00 and selected a closing date of June 29, 1987.
Three copies of this letter were mailed or delivered to the defendants. One copy was mailed certified mail, return receipt requested; although a copy of a return receipt containing Maria Anastasopoulos' name exists, dated May 22, 1987, it is not known who received it. Another was sent by regular mail. A third copy was hand delivered. That copy was delivered to the defendant, Angelo Anastasopoulos, on May 21, 1987, at approximately 6:00 p.m. at the restaurant known as Charlie's Place in New Haven, CT.
All copies of the letter were mailed on the same date that it was written, May 15, 1987. Attorney Cronin, to whom a copy of the letter was sent, was not a witness. There was no evidence as to when he received his copy of the letter.
The defendants entered into a contract of purchase dated April 21, 1987 with respect to the premises with Philip J. DeCaprio, the defendants' accountant.
The contract to purchase signed by Philip DeCaprio provided for his purchase of the premises for $132,000.00 with a down payment of $2,000.00 and a purchase money first mortgage in the amount of $130,000.00. The mortgage was to be held by the defendants, and paid by DeCaprio at a rate of 10% per annum, with monthly payments of principal and interest totaling $1140.86. The entire principal balance of this mortgage was to be paid in full on August 1, 1992.
Mr. DeCaprio, the purchaser under this agreement, was not called as a witness by the defendants. Both leases on the property were recorded in the New Haven land records and, thus constituted notice to Mr. DeCaprio and any prospective buyers of their existence. The lease of the second floor to Taso, Inc. was signed on behalf of the lessee Taso by the defendants' son. The combined monthly rent for both leases was $575.00. Given the existing leases, the financial arrangement was not advantageous for DeCaprio.
The defendants were represented by Michael T. Cronin, Esq. pertaining to the preparation and execution of said contract to purchase.
On May 17, 1987 the defendants went to their attorney's CT Page 5121 office in Branford for the purpose of obtaining copies of the documents necessary to notify the plaintiff of the contract to purchase.
On May 18, 1987 the defendants sent written correspondence, with a copy of the DeCaprio contract, to the plaintiff by certified mail, return receipt requested. The defendants' letter was delivered to the plaintiff and signed for by her on May 21, 1987, in the early afternoon, a few hours before her hand delivered letter reached the defendants.
The plaintiff initially sought a decree directing the defendants to specifically perform the contract by conveying the property to her for the price of $90,000.00 in accordance with the terms of the option to purchase. The plaintiff further sought money damages for the defendants' breach of contract. However, on August 11, 1989, the City of New Haven took title to the premises by eminent domain and the defendants, as owners of record, appealed the Statement of Compensation which was in the amount of $130,000.00. The plaintiff was allowed to join that appeal as a party plaintiff and filed her own appeal of the Statement of Compensation. Because of the condemnation she has withdrawn her claim for specific performance, but now seeks a decree that she was entitled to exercise her option prior to the taking and is, thus, entitled to the condemnation proceeds less the purchase price plus incidental damages.
The plaintiff paid rent to the defendants, subsequent to May, 1987 and up to the taking by the City of New Haven, in the sum of $12,275.00. The plaintiff paid $2,000.00 to the Lafayette Bank 
Trust Co. for an appraisal of the property. In addition, she paid two points, or $2,400.00 on the approved mortgage amount.
Further, the plaintiff paid to arbitrators in connection with two arbitration sessions under the lease, directly caused by defendants' refusal to recognize the exercise of her option. In addition, she spent $8,700.00 on attorney's fees in connection with the arbitration and this litigation. There was no evidence, however, of the portion allocated to the arbitration, itself.
The fair market value of the subject property, subject to the Taso lease, at the time of the defendants' refusal to honor the plaintiff's exercise of her option was $130,000.00, based on the contract price established in the DeCaprio contract as well as the amount set in the Statement of Compensation.
The principal issues in the case are the following:
1. Whether the lease is enforceable against the defendant lessors notwithstanding the fact that plaintiff lessee did not sign the CT Page 5122 lease.
2. Whether the plaintiff lessee effectively exercised her fixed price option to purchase when she mailed written notice of her election to exercise such option but there is no evidence of defendant lessors' receipt of such notice.
3. Whether the plaintiff lessee had the right to exercise her fixed price option once she received notice from the defendant lessors of a "bona fide offer" to purchase the leased property, triggering plaintiff's right of first refusal.
4. Whether the plaintiff lessee validly exercised her fixed price option when she provided notice of her election to exercise such option to only one of the two defendant lessors.
5. What is the appropriate remedy for breach of contract.
I. The Enforceability of the Lease
Defendants plead in their first special defense that, because the lease does not comply with Conn. Gen. Stat. 52-550, the statute of frauds, it is unenforceable.
Conn. Gen. Stat. 52-550, the statute of frauds, provides in relevant part:
 "(a) No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: . . . (4) upon any agreement for the sale of real property or any interest in or concerning real property;
Conn. Gen. Stat. 52-550 (Rev'd to 1991).
"An agreement to lease premises for a term of more than one year is within the Statute of Frauds." Galvin v. Simons,128 Conn. 616, 619 (1942); see O'Leary v. Skilton, 102 Conn. 475, 459 (1925). Further, "option agreements relating to interests in real property fall within the Statute." Montanaro Bros. Builders, Inc. v. Snow, 190 Conn. 481, 485 (1983).
 "The statute of frauds bars actions where there is not a sufficient memorandum in writing signed by the party to be charged. `In an action to enforce a contract for the sale of real property, the party to be charged, within the meaning of the statute, is CT Page 5123 the party against whom the contract is to be enforced.' Kasper v. Anderson, 5 Conn. App. 358, 362 . . . cert denied, 197 Conn. 818 . . . (1985); 72 Am.Jur.2d, Statute of Frauds 364; 1 Restatement 2d, Contracts 1135, comment a.
Booth v. Flanagan, 23 Conn. App. 579, 584 (1990). "`The party to be charged' refers to `the party to be charged in the legal proceeding, not the party or parties to be bound by the contract.' 1 Restatement 2d, Contracts 135, comment a." Kasper v. Anderson, Conn. App. at 362.
In O'Leary v. Skilton, 102 Conn. 475 (1925), lessor sued lessee for failure to pay rent in compliance with the lease. Although there was a dispute concerning whether plaintiff lessor signed the lease, the court held that "the defendant [lessee] executed it, and hence the plaintiff [lessor], however defective may be her own execution of it, may enforce it against [the lessee]." Id. at 479.
In Hansen v. Rackel, 13 Conn. Sup. 455 (Super.Ct. 1945), the purchaser brought an action to enforce a right of first refusal provision contained in a land sale contract. Although the purchaser had never signed the contract, the court held that [t]he rule in this regard in this State is that so long as the written contract is signed by the party to be charged, that is sufficient. It is not essential that it be signed by the promisee." Id. at 457; see Hodges v. Kowing, 58 Conn. 12, 18 (1889).
The evidence at trial establishes that the lease in question was signed by the defendant lessors, but was not signed by the plaintiff lessee. Nevertheless, because the lease was signed by the parties to be charged — in this case, the defendant lessors — the lease does comply with Conn. Gen. Stat. 52-550.
Accordingly, the lease does not violate Conn. Gen. Stat.52-550 and is enforceable against the defendants.
II. The Timing of Acceptance Under an Option Contract
Defendant lessors argue that plaintiff lessee did not effectively exercise her fixed price option when she mailed written notice of her election to exercise such option because defendants never received such notice.
 "In considering whether an offeree has exercised a right of acceptance in timely fashion, courts have fashioned rules that differ from those that govern acceptance of a CT Page 5124 revocable offer. Unless the parties have agreed to the contrary, acceptance under an option contract is not effective until it is actually received by the offeror."
Smith v. Hevro Realty Corporation, 199 Conn. 330, 337 (1986).
The evidence produced at trial proves that on May 15, 1987, plaintiff, through her attorney, mailed written notice of her election to exercise the fixed price option of $90,000.00 and selected a closing date of June 29, 1987. Plaintiff, however, failed to prove that this May 15th notice was ever received by the defendants. Accordingly, unless the parties made an agreement to the contrary, acceptance under this option contract was not effective until it was "actually received" by the defendants.
There is no evidence of any agreement between the parties to this action which is contrary to the general rule that acceptance of an option contract is effective only upon receipt. The option to purchase clause states that the option "shall be exercised by providing written notice of Tenant's election to exercise such Option." In Smith v. Hevro Realty Corporation, the lease agreement similarly did not specify when acceptance of the offer would be effective. Smith, 199 Conn. at 332. The Connecticut Supreme Court held that "the terms of the underlying lease were consistent with the general rule requiring acceptance of an option to be received." Id. at 338.
Accordingly, plaintiff did not effectively exercise her fixed price option by mail notice on May 15, 1987, because there is no evidence that her notice was received by the defendants.
III. The Relationship between the Option to Purchase and the Right of First Refusal
Defendants argue that in the absence of language in the lease specifying the relationship between the option to purchase clause and the right of first refusal clause, "whichever clause was exercised first would be operative." (Defendants' Trial Brief, p. 6). Defendants cite Texaco, Inc. v. Rogow, 150 Conn. 401
(1963), as dispositive of this issue.
Texaco, Inc. v. Rogow involved a ten-year lease containing both a fixed price option and a right of first refusal within Paragraph 9 of the lease. Id. at 403. The fixed price option could only be exercised during the final year of the lease, while the right of first refusal was exercisable throughout the lease period. On the last day of the ninth year of the lease, the lessee received, pursuant to the right of first refusal provision, notice of a bona fide offer from a third party. Four days later, CT Page 5125 lessee sent notice to lessor that it was exercising its fixed price option. "The decisive inquiry is whether the [lessee], after receipt of notice of the [third party] offer, could exercise its fixed price option." Id. at 405.
The Supreme Court held that "[t]he plaintiff's fixed price option could be effectively exercised only after the first nine years of the term, and then, practically speaking, only prior to the plaintiff's receipt of a notice from the defendant of a valid and bona fide offer from a third party." Id. at 409 (emphasis added). Once notice of the third party offer was received by the lessee, "the fixed price option was rendered ineffective and could not be exercised even after the close of the ninth year, and the [lessee] had to accept the first refusal offer, as provided in the lease, or risk losing the right to purchase the property thereafter." Id.
The First Circuit addressed the issue of the relationship between an option to purchase clause and a right of first refusal clause in a persuasive decision in McDonald's Corp. v. Lebow Realty Trust, 888 F.2d 912 (1st Cir. 1989). In McDonald's, the lease contained a fixed price option in Paragraph 15 which could be exercised throughout the lease period. Id. In Paragraph 24, the lease contained a right of first refusal which was similarly exercisable throughout the lease period assuming the lessor wished to accept a bona fide third party offer. Id. at 912-13. Notice of a bona fide offer was sent to the lessee, and the lessee declined to exercise its right of first refusal but notified the lessor that it would exercise its fixed price option. Id. at 913.
The First Circuit stated that it did not "see any inherent contradiction or ambiguity in giving a lessee both a fixed price option and a right of first refusal. Where the language is clear and unambiguous, as it is here, there seems no good reason under established contract law principles why the lessor and lessee should not be bound by what the lease explicitly says." Id. at 915. The court noted that in the McDonald's lease the two options were "in two completely separate paragraphs with eight intervening paragraphs between them, and there is no language joining them." Id. The court held that the fixed price option was exercisable by the lessee even after it was notified of a bona fide third party offer. Id. at 916.
The Supreme Court in Rogow initially notes that in interpreting contracts containing both a fixed price option and a right of first refusal, "[s]ince such contracts, although often generally similar, are worded differently and executed under varying circumstances, a decision interpreting and construing one contract is far from controlling in a case involving another." Id. at 405-06; see Powertest Corp. v. Evans, 665 F. Sup. 134, 138
CT Page 5126 (D.Conn. 1986); Shell Oil Company v. Prescott, 398 F.2d 5921, 594
(6th Cir. 1968), cert. denied 393 U.S. 1017 (1968).
This court concludes that McDonald's should be followed because the option provisions construed in McDonald's are nearly identical to those in the present case. First, while the lease here limits the option to purchase to the first three years of the lease, it is similar to the McDonald's lease in that both provide a substantial period of time under which the option to purchase and the right of first refusal are concurrently exercisable. Secondly, both leases use a similar format to grant these options — through the use of separate paragraphs. Therefore, because the First Circuit in McDonald's construed a lease very similar to the lease in this case, the holding in McDonald's as to the relationship between the option to purchase and the right of first refusal is persuasive authority.
Rogow is not controlling because the Rogow court construed option provisions that are factually distinguishable from the option provisions in the case at bar. In Rogow, the option to purchase in the lease was not exercisable until the final year of the lease, while the right of first refusal was exercisable — assuming a bona fide offer and lessor's desire to sell — throughout the lease period. Secondly, the lease in Rogow grants the options through the use of one paragraph. Hence, the two leases differ in three ways: 1) the duration of the option to purchase; 2) the time it may be exercised in relation to the full lease period; and 3) the format used to grant the options. Therefore, because the Rogow court interprets a lease which is distinguishable from our lease, Rogow is not controlling.
In interpreting a lease, several rules govern:
 "(1) the intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible.
Hatcho Corporation v. Della Pietra, 195 Conn. 18, 20 (1985). "A term not expressly included will not be read into a contract unless it arises by necessary implication from the provisions of the instrument." Rogow, 150 Conn. at 408. "[I]f the terms of an instrument are fairly susceptible of two or more interpretations, the one which is more equitable, reasonable and rational is to be CT Page 5127 preferred." Id. Where there is an ambiguity in a lease, the lessee is favored. Id. at 408-09; Connecticut Land Mortgage Co. v. Lesser, 136 Conn. 580, 583 (1950). However, "when two or more meanings may fairly be given to language in a contract, the language is to be construed against the one who drew it." Sturman v. Socha, 191 Conn. 1, 9 (1983).
Applying these general rules of contract interpretation to option provisions which are similar to ours, the court in McDonald's held that the lessee had the right to exercise its fixed price option after receipt of notice of a bona fide third party offer. In accordance with McDonald's, the plaintiff lessee in the case at bar had the right to exercise her fixed price option within the option period on May 21, 1987 at 6:00 p.m. despite the fact that notice of a "bona fide" third party offer was received by the plaintiff in the early afternoon of that same day.
IV. Providing Notice of Election to Exercise an Option to Purchase
Defendant lessors argue that plaintiff lessee did not effectively exercise her fixed price option on May 21, 1987, because notice of her election to exercise her option was not received by both defendants. Notice was hand delivered to defendant Angelo Anastasopoulos at approximately 6:00 p.m. on May 21, 1987, but was never delivered to his wife, co-defendant Maria Anastasopoulos. The lease states that the "Option shall be exercised by providing written notice of Tenant's election to exercise such option."
The Restatement of Agency, 22, comment (b) states in relevant part:
 "Neither husband nor wife by virtue of the relationship has power to act as agent for the other. The relationship is of such a nature, however, that circumstances which in the case of strangers would not indicate the creation of authority or apparent authority may indicate it in the case of husband and wife. Thus, a husband habitually permitted by his wife to attend to some of her business matters may be found to have authority to transact all her business affairs."
Restatement (Second) of Agency 22 comment (b) (1957).
The Connecticut Supreme Court held that "[m]arital status cannot in and of itself prove the agency relationship." Botticello v. Stefanovicz, 177 Conn. 22, 26 (1979). "[T]he fact that one spouse tends more to business matters than the other does CT Page 5128 not, absent other evidence of agreement or authorization, constitute the delegation of power as to an agent." Id. at 27. However, Botticello is not on point and addresses the issue of agency when a husband affirmatively acts on behalf of his wife to lease jointly owned property.
The Pennsylvania Supreme Court in Sidle v. Kaufman, 345 Pa. 549,29 A.2d 77 (1942), addressed the issue of whether one spouse could accept notice of acceptance of an option to purchase on behalf of the other spouse. The court held that
 `"[t]he relationship of agency cannot be inferred from mere relationship or family ties unattended by conditions, acts, or conduct clearly implying an agency" * * *; but such [marital] relation is competent evidence when considered with other circumstances as tending to establish the facts of agency and where there has been other competent evidence tending to the same end.'
Id., 29 A.2d at 81 (quoting Mitchell v. First Nat. Bank of Confluence, 136 Pa. Super. 467, 472, 7 A.2d 513, 516 (1939)). In Sidle v. Kaufman, to exercise the option to purchase, the lease required that the lessee notify the Kaufmans of his election to accept the option. Id. at 79. The husband was provided with notice of acceptance of the option, but his wife — the owner of the property — was not. The court found that the wife was not active in negotiations with the lessee, was not knowledgeable about the property insurance, was not responsible for rent collection, and believed that the lessee would deal with her husband regarding the option. Id. at 81. Therefore, the court held that the husband "was vested with a general authority to deal with the property, including authority to accept notice of acceptance of the option, and especially is this so when there is added the fact of marital status." Id.
Under the circumstances of this case, like Sidle, where there is overwhelming evidence tending to support the existence of an agency relationship between the defendants, the defendant husband here had the authority to accept notice of acceptance of the fixed price option on behalf of the defendant wife. Accordingly, the plaintiff effectively exercised her fixed price option when she provided hand delivered written notice solely to the defendant husband.
V. Remedy for Breach of Contract
Plaintiff originally sought specific performance, a decree vesting title in the plaintiff, an injunction, money damages and CT Page 5129 "[s]uch other relief as in equity or law may appertain." (Complaint, p. 4). However, due to the taking of the property by eminent domain in August 1989, plaintiff no longer seeks specific performance.
When the plaintiff effectively exercised her fixed price option on May 21, 1987, a contract for the sale of the leased property was formed. "A failure or refusal on the part of the vendor to convey the realty contracted for is ordinarily a breach of contract for which he is liable in damages." 92 C.J.S. Vendor and Purchaser 576(a) (1989). "[T]his remedy is particularly appropriate and may in some cases be the only one available where specific performance is impossible." Id. at 572.
"The general rule for measuring damages in a contract action is that the award should place the injured party in the same position as he would have been in had the contract been performed." Loda v. H. K. Sargeant Associates, Inc., 188 Conn. 69,81 (1982).
The measure of damages for a breach of an option agreement to sell land is "the difference in value between the purchase price recited in the . . . option agreement and the actual value of the lots" at the time when the option agreement was breached. Robert Lawrence Associates, Inc. v. Del Vecchio, 178 Conn. 1, 22
(1979).
In addition to a damage award for loss of bargain, "the purchaser may recover the reasonable costs and expenses of completing the sale, as, for example, the reasonable expense of investigating the title, and the expenses properly incurred in preparing to enter on the land." 92 C.J.S. at 600.
Section 331 of the Restatement (First) of Contracts states:
 "(1) Damages are recoverable for losses caused for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.
 (2) Where the evidence does not afford a sufficient basis for a direct estimation of profits, but the breach is one that prevents the use and operation of property from which profits would have been made, damages may be measured by the rental value of the property or by interest on the value of the property."
Restatement (First) of Contracts 331 (1932). CT Page 5130 "Damages should be established with reasonable certainty and not speculatively and problematically. 25 C.J.S. Damages 41. However, such damages for loss of use or enjoyment of property ordinarily are not susceptible of exact pecuniary computation and must be left largely to the sound judgment of the trier." Johnson v. Flammia, 169 Conn. 491, 500 (1975).
"`The assessment of damages is peculiarly within the province of the trier and the award will be sustained so long as it does not shock the sense of justice. The test is whether the amount of damages awarded falls within the necessarily uncertain limits of fair and just damages. Manning v. Michael, 188 Conn. 607,616 . . . (1982).'" Buckman v. People Exp., Inc., 205 Conn. 166,174-75 (1987) (quoting Herb v. Kerr, 190 Conn. 136, 139 . . . (1983)).
As to the awarding of attorney's fees, "attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception." Marsh, Day Calhoun v. Solomon, 204 Conn. 639, 652 (1987).
Applying these remedial guidelines to the breach of a fixed price option agreement, the U.S. District Court of Connecticut made a declaration that the lessee "validly exercised its fixed-price option" but would not award credit to the lessee for rental payments made since the exercising of the option. Powertest Corporation, 665 F. Supp. at 141. The court held that the rent paid was similar to "interest payable on the unpaid principal of a mortgage." Id.
Finally, the Supreme Court of Alaska held that it is improper to decree a purchaser of land to be "the owner in fee simple" as the remedy for the breach of an executory contract for the sale of land. Pollastrine v. Severance, 375 P.2d 518, 530
(Alaska 1962). "`[N]either in law nor in equity does the legal title pass to the purchaser so long as the contract remains executory.'" Id. (quoting Seguin v. Maloney, 198 Or. 272, 258,256 P.2d 514 (1953). Therefore, a decree stating that title prior to the condemnation proceeding was in plaintiff would be improper under the persuasive reasoning of the Alaska Supreme Court in Pollastrine.
There being no claim for specific performance, the court will not replace the defendants with the plaintiff in the condemnation proceeding. The court determines that the appropriate remedy is monetary damages.
In order to place the plaintiff in the position she would have been in had the exercise of the option provision been complied with by defendants, the plaintiff is entitled to recover CT Page 5131 the difference between the fair market value of the property at the time of the breach and the price set in the fixed price option, namely $40,000. Robert Lawrence Associates, Inc. v. Delvecchio, supra. Under this standard, plaintiff also may recover the rent paid to defendants after the breach, amounting to $12,275.
In addition, under pertinent case authority plaintiff is entitled to recover certain of her expenses, namely, her reasonable expenses properly incurred in preparing to take title, including the appraisal fee and points paid to the Lafayette Bank Trust Co., amounting to $4,400 plus the arbitrator's fee of $1,125. incurred in connection with the dispute arising from the breach by the defendants.
Accordingly, for the foregoing reasons, judgment is entered for the plaintiff in the amount of $57,800.00.
Barry R. Schaller, Judge.