[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Hallsmith-Sysco Food Services ("Hallsmith"), has filed this action seeking to recover monies it claims to have advanced to its former employee, Defendant Thomas Gallagher, against commissions to be earned by him as its salesman in 1989 and part of 1990. CT Page 1991
The defendant raises, as special defenses, waiver, estoppel, failure to state a claim, and the absence of an agreement to pay back advances on commissions received in 1989.
The defendant has counterclaimed, alleging that Hallsmith withheld compensation and pay for unused vacation due him in violation of 31-71b, 31-71c and 31-76k C.G.S. The defendant further claims that Hallsmith 1) breached an agreement to pay him $1,200.00 per week in wages by failing to pay him that amount for the last week he worked, and 2) breached its employment agreement with him by failing to pay him for two weeks of vacation that he accrued in 1989 but did not take prior to leaving Hallsmith.
Gallagher worked for Hallsmith as a salesman from 1987 through March 16, 1990. (He had worked for Hallsmith for an earlier period and had left for a few months before returning in 1987. The earlier period is not at issue.)
On September 7, 1987, Hallsmith, through its agent, Richard Hovsepian, memorialized the terms of Gallagher's employment with a document setting forth the amount of Gallagher' draw and maximum earnable commissions for a period of one year. (Ex. B). No evidence was presented that any such written agreement was created as to subsequent years, however, commission statements issued by Hallsmith to Gallagher for each month of 1989 indicate that his draw in 1989 was $675.00 per week. The court finds, on the basis of the testimony presented, that by January 1989 the terms of Gallagher's employment were that he was to be compensated solely by the commissions he earned on the products he sold to Hallsmith's customers. While he was allowed a weekly draw in the amount of $675.00, this draw was not a salary but a method of giving him a steady income in anticipation of his earning commissions that would exceed the draw. According to Mr. Hovsepian, the practice of Hallsmith up to January 10, 1990, when Hovsepian left to join a competitor, was to review the amount of each salesman's draw, and to adjust it each year to a figure that was in line with the actual commissions earned; however, according to Hovsepian, at least until January 10, 1990, Hallsmith did not require salesmen whose draw exceeded their earned commissions to pay back their overdraft but merely wrote it off.
During 1989, Hallsmith had a sales force of approximately 80 salesmen.
A witness for the plaintiff, Bruce Horton, testified that Hallsmith had an employee handbook detailing the method of compensating salesmen, and Gallagher signed a receipt indicating that he had been given a copy, however, neither party introduced into evidence either the handbook or any written explanation of CT Page 1992 its compensation plan for sales personnel.
In the absence of any written description of the applicable compensation plan, and in view of the fact that no witness was ever asked actually to describe in full the way the draw/commission plan operated in 1989, the court is left to determine the terms of the arrangement between the parties by the documentary evidence of what they did during the period at issue.
Exhibit C, a record setting forth Gallagher's commissions and draws for calendar year 1989, records that Gallagher began January 1989 with a recorded overdraw against commissions in the amount of $1,129.64 and that he failed to earn commissions to cover his draw of $675.00 per week throughout January, February and March of 1989. In April 1989, when his earned commissions for the month exceeded his draw, Hallsmith deducted $300.00 from his earned commissions as a partial recovery of his past overdraft. It made additional recoveries of $300.00 in May, June, July, August and December. After March 1989, Hallsmith did not carry forward on Gallagher's monthly commission statements a total of his overdraft and, except for months when it recovered $300.00, it reported "prior overdraw" as "0.00."
Mr. Horton, a vice president of Hallsmith, testified that in or about January 1990 Gallagher said he was having financial problems and requested help in the form of an increased draw. Gallagher's sales territory was subject to seasonal changes, such that winter was his time of lowest commissions and summer was his time of greatest commissions. Hallsmith agreed to increase Gallagher's draw from $675.00 to $1,200.00 and caused to be prepared a document titled Promissory Note, which Gallagher signed on January 19, 1990. That document states that Hallsmith "agreed to advance" Gallagher a draw of $1,200.00 per week and then provides as follows:
 Thomas W. Gallagher agrees and promises to pay to Hallsmith-Sysco Food Services at 380 South Worcester Street, Norton, Massachusetts any and all commissions deficit, accrued from this advance on his draw, starting June 1, 1989. Thomas W. Gallagher agrees to have all commissions and weekly draw amounts withheld till the total sum of the deficit is paid in full.
 The Note shall become immediately due and payable without notice or demand upon the severance of employment of Thomas W. Gallagher, whether self or Hallsmith-Sysco Food Services resulting.
Thomas W. Gallagher may pre-pay this note at any time. CT Page 1993
Hallsmith claims that the above agreement was consideration for the increased draw and obligated Gallagher to pay back his overdraft for 1989 as well as 1990. Gallagher did not refute the testimony that the increased draw had resulted at his request as help for his financial problems, however, he claims to have understood that his obligation to pay back his increased draw would be limited to 1990 and would be limited to recoveries from the commissions he actually earned in 1990, without obligating him to make up the deficit if he failed to earn sufficient commissions to cover the increased draw over the course of the rest of his period of employment with Hallsmith.
On its face, the promissory note makes no mention of 1989 but is limited to an obligation to pay any deficit "accrued from this advance on his draw," that is, from the time be began to receive a draw of $1,200.00 instead of $675.00. The plaintiff did not establish that it had any general policy of recovery of overdrafts, and Mr. Hovsepian testified that the policy as he knew it was to extinguish any deficits and simply lower a salesman's draw for the next year if he was not earning commissions in at least the same amount as his draw. The failure of Hallsmith to keep a running total of overdrafts on the monthly commission statements confirms Mr. Hovsepian's testimony as to Hallsmith's practice in 1989, (Ex. C) and the court therefore concludes that repayment of advance draws for 1989 was not a term of the parties' agreement. Accordingly, no overdraft may be recovered as to 1989.
The preparation of the promissory note indicates that the arrangement entered into by the parties in January 1990 was a departure from the usual arrangement of Hallsmith with its commission salesmen. The court concludes that since Hallsmith was increasing the draw of a salesman who had not been able to earn commissions to cover a lower draw, in effect loaning him money until his commissions increased, it sought protection by way of the promissory note, and that it was wary that if Gallagher quit, it would be in the position of having paid advances to a salesman who would not be present to earn the commissions for which the draw represented an advance payment. Gallagher' draw exceeded his earned commissions by $2,010.67 in January 1990, by $3,020.88 in February 1990, and by $1,187.39 in March 1990, for a total of $6,218.94. (Hallsmith stopped payment on the $1,200.00 advance for the last week Gallagher worked).
In early March, Gallagher notified Hallsmith that he was resigning and agreed to work for an additional two weeks, that is, until March 16, 1990, in lieu of notice. There was no testimony as to any discussion of claims by Gallagher for unused vacation time or by Hallsmith as to indebtedness under the promissory note CT Page 1994 until Gallagher had actually left Hallsmith.
The terms of the promissory note are clear. In return for an increased weekly advance, Gallagher promised to repay the excess of his draw over his commissions. The reference to June 1, 1990 in Ex. A is plainly a reference to the date when payment of the deficit would begin, given the context that Gallagher's sales territory brought him higher commissions in the summer. The consideration for the promise to repay was the increase in the advance, which was, in effect, a loan to a commission salesman who might not earn commissions sufficient to cover such advances.
Unless the agreement set forth in Exhibit A is unenforceable or the total is subject to reduction for one of the reasons set forth in Gallagher's special defenses, the plaintiff would be entitled by the terms of Exhibit A to recover from Gallagher the $6,218.94 excess of advances paid over commissions earned, minus a credit for unused vacation pay for 1989 in the amount of $1,708.26, that is, $4,510.68.
Gallagher argues that absent an agreement to the contrary an employee compensated solely by commissions is not liable to repay the amount by which his advances exceed his commissions. He cites Hub Floral Corporation v. McCarthy, 7 CSCR 94 (Jan. 1992), Valoco Building Products, Inc. v. Chafee, 4 Conn. Cir. 322 (1966) and Sutton v. Avery, 132 Conn. 397 (1945). These cases are inapplicable for the reason that Gallagher did in fact enter into an agreement contrary to this general proposition when he agreed in Exhibit A to repay advances in excess of earned commissions.
Gallagher contends that Exhibit A required repayment of advances only from earned commissions. The text of the agreement contains no such limitation in case of resignation, and courts will not supply contract terms that do not arise by necessary implication from the provisions of the instrument. Eastern Bus Lines, Inc. v. Board of Education, 7 Conn. App. 581, 587 (1986); Texaco, Inc. v. Rogow, 150 Conn. 401, 408 (1963). The inclusion in Exhibit A of a provision concerning repayment in case Gallagher either quit or was fired signals that Hallsmith was not proposing to make unrecoverable advances to a salesman who might leave without earning the commissions to cover these advances. Since Gallagher's earned commissions for 1989 had not been sufficient to cover the amounts which he was to receive as advances in 1990, the court does not find credible his testimony that he expected his employer to recover the advances only from earned commissions, since he could not reasonably have expected a business to make him a gift, and since the basis of his compensation remained a commission-only arrangement, not a salary.
Hallsmith' obligation pursuant to 31-71b et seq. was to CT Page 1995 pay Gallagher whatever wages, including commissions, were due when he left its employ. What was due is to be determined by the underlying basis of his compensation, which was that he was to be paid only by commissions earned on products sold. His weekly draw was not a salary but an advance payment of commissions. The court finds that when Gallagher quit his job on March 16, 1990, nothing was owed to him by Hallsmith because he had been paid all the commissions he had earned and had in fact been paid advances beyond the amounts earned. He has, therefore, failed to prove a necessary element of his statutory counterclaims, that is, that he was owed wages that were not paid him.
As to Gallagher's claim for compensation for accrued vacation pay, he failed to present any evidence to establish that Hallsmith had a policy of compensating employees for vacation time they did not use, however since Hallsmith credited him in Exhibit F with two weeks of vacation in the amount of $1,708.26, the court concludes that it must have been the policy of Hallsmith to pay for unused vacation at the rate of a salesman's weekly draw during the year the vacation time was accrued.
Hallsmith has thus paid Gallagher for unused vacation by applying a credit to his indebtedness to the company, and the court finds no violation of 31-76k C.G.S.
The plaintiff has established that it paid the defendant all wages and compensation to which he was entitled and that, pursuant to Exhibit A, it is owed $4,510.68 as repayment for monies advanced in excess of earned commissions.
Judgment shall enter in favor of the plaintiff in the amount of $4,510.68 as to its claim. Judgment shall enter in favor of Hallsmith as to all counts of Gallagher's counterclaim. The plaintiff shall recover its costs.
BEVERLY J. HODGSON, JUDGE