MEMORANDUM AND SCHEDULE RE: ORDER FOR DISTRIBUTION OF FUNDS
Before this court is the defendant's motion for order regarding the allocation of escrow funds, dated October 19, 1995. An evidentiary hearing thereon was held on April 17, 1996, with both parties present. The parties thereafter filed briefs with the court.
From an examination of the record the court sets forth the following by way of necessary background. The marriage of the parties was dissolved on September 22, 1988. At the time of the dissolution, the parties set forth a stipulation, later incorporated into the court's decree, concerning all financial and property matters. The judgment provided, in part, that the parties' marital residence be listed for sale within two years, and sold within two and one-half years. The judgment also provided for a division of the proceeds from said sale. In pertinent part, the gross proceeds were to be paid out as follows: (a) the first expense to be paid was the real estate commission and the selling cost, including closing costs and attorney's fees; (b) the second category of expenses provided for the reimbursement of agreed to "fix-up" costs and capital expenditures to the party making said expenditures; (c) the third deduction from the gross proceeds, was the payment of any existing balance of the first and second mortgages on the property, and; (d) certain "family" debts of the parties, in the sum of $ 60,000.00 were to be paid and, to the extent that the defendant were to prepay all or any of said debt, he was to be reimbursed therefore. The balance of the proceeds of sale were to be divided between the parties, with seventy percent (70%) payable to the plaintiff and thirty percent (30%) to the defendant. Moreover, each party was then to contribute fifty thousand dollars ($50,000.00) from his or her own share, into an educational trust for the benefit of the parties' two children. Any educational costs incurred by either party from the date of the agreement prior to the sale and the creation of the trust was to be reimbursed to the party paying such costs, along with any interest actually paid by that party. Further provisions of the decree will be set forth as necessary.
This court finds the following facts for the purpose of entering orders for the distribution of funds. The court has prepared a schedule, Schedule "A", attached hereto and made a part hereof, for ease in explaining and articulating the orders for distribution. The categories of the schedule are explained in the order on which they appear thereon (A through F.). CT Page 4069-R
A. PROCEEDS IN ESCROW
The parties' residence was actually sold on or about May 31, 1994. The categories of expenses set forth as (a) and (c), above, were satisfied from the gross proceeds of the sale. There was also a partial distribution of $320,000 to the parties: $224,000 (70%) to the plaintiff, and $96,000 (30%) to the defendant. The remaining principal balance, in the sum of $752,722.75 was placed in an interest bearing account with the escrow agent. Through April 3, 1996, accrued interest was $67,156.15, for a total of $819,878.90.
B. CALCULATION OF DISTRIBUTION PER JUDGMENT OF SEPTEMBER 22, 1988.
The defendant has paid costs for the fix-up of the property, in the sum of $12,489.97, to enhance its sale price, and has also paid the family debt of $60,000. He is entitled to reimbursement for these payments, as set forth in the judgment. In addition, and subsequent to the judgment, the property developed a water problem and certain experts were called in to make recommendations concerning and/or rectifying it. The invoice of Leggette, Brashiers and Graham remains outstanding in the sum of $4,015.26. This is similar to a "fix-up" cost and should be borne equally by the parties, before their pro-rated distribution. Additionally, and as explained more fully below, quite some time after the judgment the court appointed a committee to handle the sale of the property. The invoice of the committee, Karen L. Williams, for $350.00 is also an expense which will be shared equally by the parties.
Therefore, the subtotal before the pro-rated distribution is $743,023.67.
C. PRO-RATED DISTRIBUTION
At this point, the judgment provides that the plaintiff was to have received seventy percent (70%) of the net proceeds, $520,116.57, and the defendant was to have received thirty percent (30%), $222,907.10.
D. EDUCATIONAL TRUST CONTRIBUTIONS
At the time of the marital dissolution, the parties prepared and executed a written "Stipulation Regarding Post-Majority Support." The stipulation was incorporated into the court's CT Page 4069-S decree.
The pertinent parts of this agreement are set forth as follows:
 "The parties hereby agree that at the time of the sale of the family residence, anticipated to be listed for sale prior to May, 1991, each party shall contribute from his or her share of the proceeds the sum of fifty thousand dollars ($50,000), each, to be deposited into an interest bearing trust fund for the higher education of the parties' two children . . .
 "Any cost incurred by either party from this day forward for the educational expenses of the children prior to the sale of the residence and the creation of the trust fund shall be reimbursed to the party paying such cost, along with interest if such party has actually paid interest. Such reimbursement shall be paid from the one hundred thousand dollar fund at the time of its creation."
The parties' two children received their higher education over periods of time between 1988 and 1994. The defendant incurred all educational costs; the plaintiff incurred none. The total educational cost incurred by the defendant subsequent to the decree, was $171,179.43. He claims that, under the language of the stipulation, the plaintiff is liable for half of that cost, $85,589.71, with interest thereon at ten percent as actual expenses were incurred, of $28,512.24, for a total of $114,101.95. The plaintiff maintains that each party's obligation was limited to $50,000, and that the defendant's expenses in excess of the $100,000 total were outside the scope of the stipulation and should be borne only by him.
C.G.S. § 46b-66 provides in relevant part that "[I]f the agreement is in writing and provides for the care, education, maintenance or support of a child beyond the age of eighteen, it may also be incorporated or otherwise made a part of any such order and shall be enforceable to the same extent as any provision of any such order or decree . . ." Where, as here, the provisions of an educational agreement have been incorporated by reference into the decree, it is necessary to ascertain the intent of the parties as expressed in the language of the agreement rather than to construe the language of the decree itself. McDonell v. McDonnell, 166 Conn. 146,150 (1974). The agreement is to be regarded and construed as CT Page 4069-T a contract. Greenberg v. Greenberg, 26 Conn. App. 591, 595 (1992).
This court agrees with the plaintiff, that her financial exposure for the educational expenses of the children is limited to a fifty thousand dollar contribution. The parties' agreement and the stipulation regarding post-majority support clearly set forth that the property was to be listed for sale within two years of the decree (September, 1990), and that the sale was to take place within two and one-half years (March, 1991). The educational trust, funded by the parties' contributions, was to be in place upon the sale in March, 1991. Unfortunately, for reasons explained below, the property was not sold until May, 1994 and, as of this very date, no educational trust fund has been created. Therefore, this court is left to decide the question of the intent of the parties under the agreement and in these circumstances.
In interpreting contractual terms, the intent of the parties is to be ascertained by a fair and reasonable construction of the parties' written words. Eastern Bus Lines, Inc. v. Board ofEducation, 7 Conn. App. 581, 586 (1986). The only fair construction to apply to this agreement, is that each party was obligated to make a $50,000 contribution for the children's educational expenses, and the parties could seek reimbursement therefrom. This interpretation is consistent with the stipulation's language that "Such reimbursement shall be paid fromthe $100,000 fund at the time of its creation." (Emphasis added). The defendant's argument, that all expenses incurred prior to the May, 1994 sale date are reimbursable, cuts too broad a swathe. Such an interpretation would render meaningless the $100,000 limitation of the fund and that the parties were to receive reimbursement from the fund. "Parties generally do not insert meaningless provisions in their agreements and therefore every provision must be given effect if reasonably possible." HatchoCorp. v. DellaPietra, 195 Conn. 18, 23 (1985).
Therefore, in Section "D", the court subtracts $50,000 from the share of each party's pro-rated distribution. The $100,000 fund is to be recaptured in total by the defendant, inasmuch as he has paid for the children's educational expenses a sum far in excess of that. At this stage, then, the parties' pro-rated distribution after the educational trust contribution is for the plaintiff, $470,116.57, and for the defendant, $172,907.10.
E. DEBITS AND CREDITS
CT Page 4069-U
Next, the court must address the defendant's claim that the plaintiff's pro-rated share should be debited, and the defendant's share credited, for (1) interest on his share due to the plaintiff's alleged acts of contempt and unlawful detention of the defendant's share; (2) the defendant's attorney's fees in implementing the judgment, and; (3) the plaintiff's further acts in destroying or not returning certain items of personalty belonging to the defendant but which were to remain with the plaintiff until the date of sale. The court considers this in the sequence presented.
The first claim is for interest. C.G.S. § 37-3a provides in relevant part that ". . . interest at the rate of ten percent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable." However, the award of interest is discretionary with the court, and the court must determine not only whether the money is payable, but also whether the detention of the money has been wrongful. Patron v. Konover, 35 Conn. App. 504, 517-518 (1994), cert. denied, 231 Conn. 929. Our Supreme Court and Appellate Court have approved the application of Section 37-3a to domestic matters, where warranted. See, Markus v. Markus, 175 Conn. 138, 146 (1978);DeMattio v. DeMattio, 21 Conn. App. 582, 592-593 (1990); LaBow v.LaBow, 13 Conn. App. 330, 352-353 (1988), cert. denied, 207 Conn. 806.
In this case, the court concludes that the plaintiff has unlawfully and wrongfully detained the defendant's share of the proceeds he was to have received under the court's decree. A review of the court file and record indicates the following. Subsequent to the stipulation and judgment, the plaintiff moved to reopen the judgment. This motion was denied. The plaintiff moved for permission to file a late appeal, which was also denied. As the time for the listing and sale of the property drew near, the plaintiff consistently and wilfully refused to cooperate in listing and selling the property. The defendant filed a motion for contempt in July, 1991, which finally produced a stipulation regarding the listing of the property in September, 1991. The plaintiff failed to abide by the stipulation, and the defendant filed another motion for contempt in March, 1992. No orders were entered on this motion. The defendant filed yet another motion for contempt, as a result of which the plaintiff was found in contempt by the court (Ryan, J.) in April, 1992, and she was ordered to sign a listing. The plaintiff failed to do so. A further order to sign a listing was directed against the plaintiff in December, 1992. In the interim, the plaintiff filed a motion seeking to disqualify the CT Page 4069-V same broker she had approved in the stipulation, from taking the listing. This motion was denied in May, 1992. In the same month, the defendant moved for sanctions against the plaintiff for her failure to sign a listing. No order was entered on that motion. In July, 1992, the defendant moved for a scheduling order for a hearing to establish the damages he had sustained as a result of the plaintiff's continued contempt in failing to sign a listing. In November, 1992, the plaintiff had still not signed the listing, and the defendant again moved for an order compelling her to do so.
The case then meandered its way into 1993. In January, 1993, the defendant moved for an order and further findings of contempt against the plaintiff for her continued failure to sign a listing; the defendant also expressly reserved his right to pursue his damages claim at a hearing on the distribution for the net proceeds of any sale. In February, 1993, the court (Novack, J.) ordered that the plaintiff sign a listing before she left the courthouse. Apparently, this finally persuaded the plaintiff to sign a listing. Afterwards, there was a prospective buyer for the property. The plaintiff, however, refused to participate in the closing process or to sign documents required to close the property. The defendant moved for an order to compel her to do so in May, 1993. In June, 1993, the court ordered that the plaintiff execute documents required to close the property. The plaintiff then took an appeal from this order in July, 1993. She also moved the trial court (Novack, J.) to vacate its order, which was denied in August, 1993. In the meantime, the plaintiff persisted in her motions to set aside the original 1988 judgment, by filing a new motion in September, 1993. The defendant was then obligated to file a motion to appoint a committee to sell the property, which was granted in November, 1993. The plaintiff filed further motions to reopen the 1988 judgment without success. In September, 1993, the defendant again moved for an order of contempt and sanctions against the plaintiff. This was granted in November, 1993. (Novack, J.), with an order that a hearing be held at a later day to determine damages. The plaintiff filed another substituted motion to open the 1988 judgment, which was again denied in October, 1993. Also in late 1993, the defendant filed a supplemental motion for contempt regarding the plaintiff's destruction of a piano, which belonged to the defendant but which was left with the plaintiff in the marital residence until the sale. For a third time, the plaintiff was again found in contempt in November, 1993 (Novack, J.), with an order that a hearing was to be held at a later date to determine the defendant's damages. The plaintiff then filed a motion to reargue the earlier motion to reopen the 1988 judgment; CT Page 4069-W this was denied by the court in November, 1993. This year was brought to a close by the plaintiff's filing of yet another appeal from the court's orders in November.
The property finally sold in May, 1994. The defendant filed a request in June, 1994, for a hearing on the distribution of the sale's proceeds. In 1995 the Appellate Court affirmed, per curiam, Judge Novack's orders. The plaintiff filed a petition to the Supreme Court for certification to review the Appellate Court's decision, which was denied in July, 1995. The defendant then again moved for an order for the distribution of funds, in October, 1995. A hearing was scheduled before the court (Harrigan, J.). The defendant and his counsel appeared; the plaintiff, who was in Germany, did not. At the request of the plaintiff the hearing was rescheduled for, and did occur on April 17, 1996 before this court.
The plaintiff has engaged in a wilful and repeated course of obstructionist and contemptuous conduct over a period of several years. The plaintiff caused a sale that was to have occurred in 1991, to occur in 1994. The plaintiff then further delayed the distribution of funds until this year, 1996. This court is firmly convinced that interest should be awarded to the defendant. The open question is, on what amount and over what period of time.
The court awards the defendant the sum of $85,000 in interest. This is calculated as follows. The court first takes the principal balance of the escrow funds without interest, $752,722.75, and subtracts the four items set forth in Schedule "A", Section B, $76,855.23, for a difference of $675,867.52. The defendant's thirty percent share of that sum is $202,760.26. The court then adds back into that sum the Section B recoveries by the defendant ($12,489.97 plus $60,000) and his contribution to the educational trust ($50,000). This produces the defendant's total share of $325,250.23, which he would have received had the sale closed as and when expected. The court awards interest on this share at the rate of 10% per annum from September 3, 1991 until May 31, 1994. The court uses these dates because September 3, 1991, was both six months after the contemplated sale date and the date the parties stipulated to sign a listing and use a designated broker. The court sets the outside date for interest as May 31, 1994, because this was the date of the sale and the proceeds were deposited into an interest bearing account. Therefore, all monies have been earning interest since that date and it would not be equitable to award the defendant the additional statutory interest thereafter. CT Page 4069-X
The interest calculation, then, is: $325,250 at 10% a year for two years, nine months (2.75 years), which equals approximately $89,400. The court, in its discretion, does award $85,000 in interest.
The defendant's next claim is for attorney's fees. The defendant has testified, and his counsel has presented affidavits, from which the court finds that the defendant's total attorney's fees incurred in this dissolution action, have been in excess of $90,000. The award of counsel fees in a dissolution action is normally left to the broad discretion of the court. C.G.S. § 46b-87
allows the court to award a contempt petitioner a reasonable attorney's fees against the person found in contempt, if the contempt is based upon orders entered under sections delineated therein. The award of attorney's fees under this section is within the sound discretion of the court. Tatro v. Tatro, 24 Conn. App. 180
(1991).
In this case, the plaintiff has wilfully, blatantly and repeatedly violated multiple orders of the court regarding the listing and sale of the property, and was thrice found in contempt thereof. As a result of the plaintiff's malfeasance, the defendant incurred substantial attorney's fees and costs in an effort to compel the plaintiff to obey the court's decrees. See, Friedlanderv. Friedlander, 191 Conn. 81, 86 (1983). The court has carefully examined the evidence submitted concerning the defendant's counsel fees. None of the charges are found to be inappropriate. However, the court believes that an award of $30,000 in attorney's fees to the defendant, as a result of the plaintiff's contemptuous acts, is fair and reasonable. A determination of exactly what fees to award, in a situation such as this occurring over a period of many years, is virtually incapable of precise determination. However, the court uses a relevant window of between April 6, 1992, the date the plaintiff was first found in contempt, to May 31, 1994, the date of the sale of the property. During this time span, the defendant's fees approximated $60,000. Not all of the legal services incurred by the defendant related to the plaintiff's contemptuous behavior. Also, many of the defendant's motion and other filings were denied, not prosecuted to an order, or were otherwise inconsequential. Accordingly, the court enters an award of attorney's fees for $30,000.
Finally, the court must consider what damages, if any, to award to the defendant for the plaintiff's wilful destruction of a piano belonging to the defendant but left in the plaintiff's care, CT Page 4069-Y and the plaintiff's failure to return a certain camera to the defendant. The plaintiff was found in contempt for the former act. The court awards the defendant $1 as nominal damages for the plaintiff's failure to return these items of personalty to the defendant. No reliable evidence was introduced as to the basis for the determination of these losses. See, D'Addario v. Viera,8 Conn. App. 152, 153 (1986). Nominal damages are appropriate where the damages exist only in name and not in amount. Sessa v.Gigliotti, 165 Conn. 620, 622 (1973). That is the case here.
F. JUDGMENT CREDITS AND EDUCATION CONTRIBUTION RECAPTURE
The total of the Section B and Section D recoveries to the defendant is $172,489.97.
G. DISTRIBUTION PER ORDER
The difference between the plaintiff's pro-rated distribution after the educational trust contribution (Section D) of $470,116.57, and the debits for interest, attorney's fees and contempt damages (Section E), is $355,115.57. As noted, infra, she previously received $224,000 as a partial distribution. Therefore, the plaintiff's total distribution is $579,115.57.
The addition of the defendant's pro-rated distribution after his educational trust contribution (Section D) of $172,907.10, with the credits to his share (Section E) and judgment credits and education contribution recapture: (Section F) produces a distribution of $460,398.07. Again, as noted infra, the defendant received a previous partial distribution of $96,000. Therefore, the defendant's total distribution is $556,398.07.
JOHN F. KAVANEWSKY, JR., JUDGE
SCHEDULE A.
A. Proceeds in Escrow Principal Balance $752,722.75 Accrued Interest $ 67,156.15 $ 819,878.90
B. Calculation of Distribution per judgment 9/22/88 B. Risser $ 12,489.97 Fix-up costs B. Risser $ 60,000.00 CT Page 4069-Z Family debt recovery Leggette, Brashiers $ 4,015.26 Water expert Karen L. Williams $ 350.00 — $ 76,855.23 Committee Fee Subtotal before pro-rated distribution $ 743,023.67
C. Pro-rated Distribution M. Risser (70%) B. Risser (30%) $ 520,116.57 $ 222,907.10
D. Less educational trust contribution ($50,000.00) ($50,000.00) B. Risser ($100,000.00) educational trust recapture Pro-rated Distribution after educational trust contributions M. Risser B. Risser $ 470,116.57 $ 172,907.10
E. Debts — Credits:
 1. Interest ($ 85,000.00) $ 85,000.00 2. Attorneys fees ($ 30,000.00) $ 30,000.00 3. Contempt Damages ($ 1.00) $ 1.00
F. Judgment Credits and 0.00 $ 172,489.97 Education Recapture Trust -------------- --------------
G. Distribution per Order $ 355,115.57 $ 460,398.07 Previous Distribution $ 224,000.00 $ 96,000.00 ------------- -------------- Total Distribution $ 579,115.57 $ 556,398.07 ------------- --------------
CORRECTED CAPTION
CT Page 4069-AA